Cook. And we'll turn to the next case on the day calendar. Docket number 20-3908, Hund versus Bradley. And we'll hear from Ms. Rosenbluth. Good afternoon, Your Honors, and may it please the court, Farrah Rosenbluth for appellant. As of earlier this afternoon, the State Liquor Authority guidance at issue has been revised to make clear that consistent with Department of Health guidance, bars and restaurants are now permitted to host live indoor ticketed performances. That means that the incidental music limitation that is the subject of this appeal is no longer in effect as previewed in my April 8th letter to the court. The SLA's website has also been updated accordingly. While the appeal is thus technically moot, we recognize that an exception to mootness likely applies under the Supreme Court's decision in Roman Catholic Diocese and also its decision in Tandon v. Newsom issued this past Friday. If this court agrees that an exception to mootness applies, it should proceed to analyze plaintiff's First Amendment claim and vacate the injunction on the merits. Turning to the merits, the district court made two fundamental errors in entering the preliminary injunction. It misapplied the law of both standing and the First Amendment. I'd like to take these out of order and focus first on the merits of First Amendment claim. The district court's holding in this regard was premised on a critical flaw and held the state's prohibition on holding indoor ticketed concerts during the pandemic fails intermediate scrutiny because it sweeps too broadly and restricts a significant amount of speech that is unrelated to the state's interest in preventing the spread of COVID-19. But the court did not actually identify any categories of speech that are restricted by SLA guidance besides live main draw concerts and indeed accepted the state's justification for restricting those concerts, namely that they are more likely to draw crowds and thus pose a higher risk of virus transmission. This case is therefore very different from the Vincenti case that the court relied on involving a paradigmatic example of an overly broad restriction in which this court joined a city ordinance that made it illegal for anyone under the age of 21 to even possess a can of spray paint. Even though the city had a legitimate interest in preventing graffiti vandalism the court reasoned, the ordinance prohibited young people from possessing spray paint even if they simply wanted to lawfully use it in an art project. The city thus improperly restricted a substantial quantity of speech that had nothing to do with its interest in preventing prohibited are main draw concerts, a category of speech that is undisputedly associated with higher risks of virus transmission. And while plaintiff attacks the distinction between incidental music and main draw concerts as arbitrary, that distinction actually shows that the state has distinguished between comparatively higher and lower risk activities, meaning that the state has refrained from burdening substantially more speech than would necessary to further its legitimate interest. The guidance also leaves open ample alternative channels of communication and plaintiff does not argue otherwise. Musicians like plaintiff are free to perform as an accompaniment to dining and may of course perform main event shows over streaming services or other virtual platforms. The guidance is therefore entirely consistent with plaintiff's first amendment rights. Plaintiff also lacks standing because in joining the guidance cannot and has not redressed his injury. Even in the absence of the guidance, plaintiff was until very recently still bound by other executive orders, executive orders and regulations that independently prohibit concerts. In particular, EO 202.8 that was issued in March of 2020 required all non-essential businesses to reduce their in-person workforces by 100 percent and subsequent Empire State Development guidance explained that establishments that host concerts and in-person performances are non-essential. Also, when certain arts and entertainment venues were permitted to reopen in June of 2020, the Department of Health issued guidance explaining that indoor concerts were still prohibited. So, when the SLA issued its guidance in August of 2020, indoor concerts were already prohibited under various independent regulations. Thus, in joining the guidance, did not and could not redress plaintiff's injury which flowed from the rules and regulations that were already in place well before the guidance was issued. This court should therefore vacate the preliminary injunction and I welcome the court's questions. Thanks very much. Judge types of incidental music that may be provided. Incidental music is background music that is not meant to be the draw itself. So, for example, it could be a jazz brunch type of situation. For example, Mother's Day brunch that has a jazz pianist playing in the background but it's not advertised as a main event that people are coming to see. Can it be advertised as incidental music? Yes, the restriction does not prohibit establishments from advertising that they are offering incidental music. So, for example, that advertisement that said Mother's Day brunch with live jazz pianist accompaniment, that would be permissible. Okay, thank you. Mm-hmm. Judge Bianco? Yeah, I want to follow up on Judge Kearse's question. Ms. Rosenbluth, first of all, just on the standard, if something is so under inclusive that it becomes arbitrary, then it could not satisfy intermediate scrutiny in terms of the law, correct? That's theoretically correct but that's not this case. All right, let me ask you about the rule of the incidental just following up on Judge Kearse's question. So, if it's a jazz club and it's advertised, tonight at the jazz club, so-and-so is going to perform incidental music to the dining. It'll start at 7 p.m. The state in your brief says that's footnote two, that you've never argued advertising incidental music is impermissible. So, that would be okay? Yes, if it's advertised that dining, that music will accompany dining, yes, that would be permissible. Why would that, you know, I understand all the interests that are cited. You want people arriving at the same time, you want them leaving at the same time, you want them singing out loud, but if you're allowed to have a jazz club and call it incidental music, there's no difference than having it at a theater with the same number of people who aren't eating. In fact, an argument can be made if they're not eating that there's less spread because they don't have to take their masks off. They could just, you know, watch the concert, right? Isn't that arbitrary? You can have, and some, as you know, some of the venues in New York City, there's 10,000 square foot restaurants that can get a lot of people in there. So, a couple points, Your Honor. First is that if an advertisement were to say incidental music beginning at 7 p.m. to 10 p.m., that would start to look a lot more like a main draw, and I think you'd have to look at the contextual ad in context to see whether it's truly advertising background music or it's really trying to say this is a show that we're attracting customers to. That said, the advertising restriction here is not at issue. Plaintiff himself is a musician. He is not a licensed SLA establishment, so even when it was in effect, the guidance did not purport to regulate what plaintiff himself could and could not say, and he is not seeking permission, and he has never argued that the guidance impermissibly infringes on his right to publicize his event. No, we're not talking about the right to advertise. The point I'm trying to make to you is that it becomes arbitrary if you can advertise for the incidental music, and I don't want to focus so much on the time. If you say for dinner, I'm not sure why the particular time would be a matter. People would know when to go, and the argument would be if they can make a reservation, right? They can make a reservation. If you advertise so-and-so is going to be playing incidental music at the jazz club tonight, make a reservation. That would be okay, right? So, I mean, I think what you're highlighting is underinclusive. I think I would reframe it as evidence of narrow tailoring. You know, the state has identified- That's the answer to my question. Can you make a reservation then? I'm sorry. Can you make a reservation? For the jazz show. I mean, you could make a reservation for dining, and-  Well, you can't have ticketed events, and you cannot advertise that a live pianist is the draw of your concert, of your event. The only difference is me saying this is incidental jazz music as opposed to such-and-such jazz performer performing, I don't know, a main show, a live show. That's the distinction in the advertisement? I mean, the distinction would be if-I mean, you have to look at how the establishment is presenting the event. If it's going to be that you're having-if you're offering a regular dinner service, and there's going to be music in the background, and then, yes, you can host diners, and you can host-you can make reservations as you normally would. But, you know, I'd just like to focus on the fact that the state has identified activities that are supported as being higher risk versus lower risk, and it has outright restricted only those activities that are higher risk. All right. Let me just-I have two more quick questions. One is on the mootness issue. Is it the state's position that it's six months from now, there were, you know, another variant, and there were big uptick in cases, that if the governor wants to reinstitute the executive order and or the incidental music rule, that he would then now have to go to the legislature at that point? How does the recent enactment by the legislature affect the ability of the governor to do this six months from now on his own? Well, the amendment applies to executive orders, so it's not directly implicated in this case because this is the guidance at issue, but that said, it essentially provides that the governor can extend or modify directives that are in effect. So, there are currently still in effect directives, and it can modify-I'm sorry, he can modify directives insofar as amending the percentage limits or closure times, so on and so forth. So, six months from now, he wouldn't have to go to the legislature? It's your position he could reinstitute what had existed previously without going to the legislature? Well, there's a window of the governor has to notify the committee chairs in the senate or assembly and describe the need for an extension at least five days before the modification or extension is implemented, and so there is a process to consult the legislature, and the innovation of the new amendment to the executive law that provides for additional oversight by the legislature. So, yes, that is- My last question is, you mentioned standing, but I think that's not really a redressability. Standing goes by what's in the complaint. You're talking about standing for purposes of the injunction. So, in his complaint, he seeks to invalidate both the executive orders in paragraph 28 and at the end, and the rule, the SLA guidance. So, he has redressability in his complaint. What I think you're arguing, even though you're not framing it this way, is that there was no irreparable harm in the absence of an injunction because by obtaining the injunction, he was going to suffer the same harm through the executive order. Isn't that what we're talking about? We're not talking about redressability. We're talking about the lack of irreparable harm because he didn't seek a preliminary injunction as to everything. I think it's both, Your Honor. Certainly, the irreparable harm element was definitely lacking, but I do think the regressability portion is lacking as well. I don't think it's really a fair read of the complaint that plaintiff is challenging each and every single- Paragraph 28 says, plaintiff prays for immediate relief from the unfair and unconstitutional executive's orders and related regulations, policy, etc., etc., and then granting a preliminary straining order and a permanent injunction in a declaration that the challenged executive orders are unconstitutional and therefore void. Isn't that pretty clear? I mean, he literally says that. He does not really devote any attention to any other executive order that cover really a very wide array of topics from physician licensing to school closures, and so on and so forth. He just devotes his entire complaint to the incidental music rule, which is found in the guidance. I think that it is a defect in the complaint, and it is a jurisdictional defect, but Your Honor is certainly correct that there's also the irreparable harm element that his injunction certainly only seeks an injunction against the incidental music rule, as he puts it, and the district court understood him to be asking simply just for that as well. By granting the injunction, he still is suffering the same injury that he did before the injunction pending appeal back in January, and so I do think there's a redressability problem, but certainly there's also an irreparable harm problem as well. All right. Thank you very much, and I thank Judge Cabanis for giving me some extra time. Thanks very much. Ms. Rosenbluth, you reserved two minutes, but we'll turn to Mr. Speroni. Thank you, Your Honor. May it please the court, Peter Speroni for plaintiff Pelley. I want to first start by addressing the letter that was filed on Friday from Ms. Rosenbluth. In particular, there's something concerning about the links that were provided in the additional guidance that's being put out by the FOA and the Department of Health. I don't... Are you there, Mr. Speroni? Yes. Yes. Are you there? Yes, I'm here. You may have hit... You went mute as far as my reception was concerned, but why don't you pick it up? Apologies, Your Honor. Okay. Since the beginning, we have been arguing that the rule is arbitrary because there is no real distinction between an incidental music artist and a main draw artist. The state has relied thus far on the declaration by Dr. Dufour, which categorizes incidental music artists in one category and then distinguishes those artists from main draw artists and lists out five reasons why main draw artists are different from incidental music artists. And the reasons that they give, that they have relied on in district, that they have relied on in the motion to stay in here on appeal, is that a main draw artist creates common arrival and departure times, whereas an incidental music artist does not. This has been their clear position since day one. And now in the attached PDF in the letter filed on Friday, in the New York State Department of Health Interim Guidance for Small and Medium-Scale Performing Arts and Entertainment, as of April 1st, 2021, the state is now defining, changing their entire definition of what incidental music artists are and has separated an incidental music artist into two categories. One is a passive incidental music artist, and the other is an active incidental music artist. An active incidental music, now according to defendants, is one that can create common arrival and departure times. This runs counter to everything that Dr. Dufour has been saying since the beginning of what is different between an incidental artist and a main draw artist. And at this point, because that is such a way in on the definition of incidental music, of the factors of what we're supposed to recognize as incidental music, so that I can properly respond to the appeal in those factors that make up the categories of which they define as a main draw artist. They're not necessarily just changing the rule, they're reinventing the wheel. It's now that an incidental music artist can in fact create common arrival and departure times, which is prima facie evidence that the rule is arbitrary. We have always argued that there is no difference between an incidental music and a main draw artist, and they have said the reason why that there is a difference is because main draw artists have common arrival departure times, they're shouting and singing at a main draw event. There's alcohol use, and the music goers will act unruly if they drink alcohol, the length of time spent at the venue, and the number of patrons. So now it seems that the very definition of incidental music has now changed. So I respectfully ask the court to possibly ask defendants to clarify on whether or not the first common, or the first test, the first prong of that test of the main draw artist is currently their position, or if they agree now that an incidental music artist can in fact create common arrival and departure times. Well, you should continue your argument. I don't think it's appropriate to invite us to ask your questions of opposing counsel. Why don't you just proceed? Okay, in regards to the letter additionally to that, the second to last paragraph shows, again, evidence that this regulation was never narrowly tailored to SLA licensed establishments. It was never narrowly issued at a time when no such venues were allowed to be open. That is simply untrue. SLA licensed established facilities were allowed to be open when the phases started to reopen in June, and they were allowed to have live music if their license specifically allowed for it. What the defendants have done, have argued, is that the action of allowing a musician to play at an SLA licensed facility will create a concert. We're never arguing that the concert halls of New York State should be open. Even in the Southern District case, they weren't arguing that either. We're not arguing that the concert halls are open. Of course not. But the issue at hand here is the allowed to host live music if their license specifically allows for it, which goes to the redressability here of allowing our plaintiff to reduce his harm by keeping the injunction in place. If the injunction is reversed, he is no longer allowed to earn his livelihood at those facilities. To the question of whether or not it was narrowly tailored, it's a little bit short notice, but I do think it's very relevant to the court here. If we're looking at the regulation as applied to concerts and event spaces across New York State, they pale in comparison, number-wise, to those of SLA licensed establishments. According to an article from the SLA that I have brought up, and I would be happy to provide the court, is a map of all SLA licensed facilities in the state of New York. From 2007, when this map was taken, there were 55,000 licensed facilities within New York State. Concert halls and concert venues, from my map so far, are eight concert and opera halls, 20 performing arts centers, five jazz clubs, and 73 music venues, and another 13 venues on top of that. They pale in comparison to the number of 55,000. In this letter, it says that the regulation was actually written for those large entertainment events, which pale in comparison to the number of SLA licensed establishments. They're just applying that regulation meant for those concert halls, which is a substantial government interest, of course, to control COVID-19, but they're applying that guidance to the SLA licensed establishments. That is not narrowly tailored to the 55,000 licensed establishments across New York State. It may be narrowly tailored to the under 200 concert halls that New York State has, but they're applying a law, I'm sorry, the executive order to all the 55,000 SLA establishments. It's just not narrowly tailored at all. In terms of the standing here, Plaintiff has been a gig musician for 47 years of his life. It is all he knows. It is how he makes his livelihood. He sells tickets to his events. He gets paid a cut of the cover charge. He contracts with these facilities, SLA licensed establishments, for 47 years of his life. It's all he knows. What the defendants are saying to him is, we have absolutely no issues with you being an incidental music artist. You can play your music no problem on one requirement. You absolutely are not allowed to be paid for it. In 2020, telling somebody that they are not allowed to be paid for the only thing they know how to do to make money and provide for their families is such an insult to musicians like Plaintiff and others across the state. You have one minute left. Sure. Thank you. The direct regulation did not mention musicians. It was to venues. However, he has standing because he contracts with these venues. The Southern District case admitted this much as well by saying that it has affected their ability to contract with musicians across New York State. It has effectively made them not be able to book revenue streams that are brought into their facilities. The odd part about this is there is absolutely no prohibition whatsoever on advertising anything else within that establishment, even though those things that there are no prohibitions to advertise, such as alcohol, is the very reason why Dr. Dufour feels that music events are a problem. She argues that music goers who go to main draw musician events will act more unruly if they drink alcohol than if they go to have a at this point how the defendants continuously ask the court to not weigh in on their science, but I do think it's fair for the court to ask at what point is this evidence in the scientific process. Dr. Dufour has alleged that five common things happen with main draw artists, and they do not with incidental music artists. I'm simply saying that there has been absolutely no claim because in order to actually have that evidence, you would have had to study the behaviors of patrons of concert goers throughout New York State prior to 2020. The state simply doesn't have that data. It does not exist. So these are just part of a scientific process. This is hypothetical conjecture. I say that an incidental music patron acts this way, and I say that a main draw patron acts this way. Well, why? Why do they act that way? Where's the data that backs that up? And then the response from defendants is the court should not weigh into our science. I think the court could weigh in into the steps in which the science is at. It's right now a hypothetical. When responding to our win in district in November, a spokesman for our spokesman for SLA said that it was unconscionable for businesses to even question their proven methods in controlling COVID-19, nothing of which has been proven by any stretch of the definition. Nothing has been proven. This kind of thing sends a chilling effect to everyone else across the state who earn their livelihoods as musicians. They're no longer being able to express themselves as part of live ticketed events and advertise those events. And as defendant's counsel was just saying, there isn't a clear understanding of how an incidental music artist can advertise at a jazz club for Mother's Day brunch. Well, what if that incidental music artist was Eric Clapton? Well, he'd probably draw a few people, even though he wasn't the main event. The Mother's Day brunch was first. I mean, round and round and round we can go. If we look at singing and shouting claim, which is the second element of a main draw artist, according to Dr. Dufour, if we look at singing and shouting is only associated with main draw artists. This is simply untrue. Kenny G is a very recognizable main draw artist. There is absolutely no shouting or singing at his events. There are no words. Take a very famous violinist. There are no words. The idea that people who go to listen to music are going to act unruly and disregard all other types of COVID regulations and rules that are in place is just absurd. It's insulting the music community. They deserve to be heard. They deserve to have their livelihoods preserved. With that, I would rest my time for any questions. Thanks very much. Judge Kears, any questions? Am I correct that this is a preliminary injunction that was entered, not a permanent injunction? Yes, you're right. At what stage are the proceedings in the district court? We had decided that they would be stayed until the resolution of the appeal, Your Honor. Thank you. Judge Bianco? Thank you. Mr. Speroni, in the district court's order, it said nothing in this order precludes the state from enforcing any executive order. It only related to the SLA guidance, right? Correct, Your Honor. Then when you were before this court in January on the issue of whether or not it should be a stay or not, you conceded because of that that your client was still performing live music because of the executive orders, even though the SLA guidance had been enjoined, right? Your Honor, I think in oral arguments, are you saying in the oral arguments that day? Yeah, I listened to it. It said my client still can't perform because of the executive orders, right? Well, yes. I do want to clarify that my client is not prevented from performing at SLA-licensed facilities that have a license to have live music. So, he is able to perform at those facilities even with executive order 202 because- That's not the state's position. The state's position is that without the guidance, 202, I think it's 0.8, indoor concerts are not allowed. They would have to reconcile that portion of the guidance that still remains. The district court judge enjoined them from only taking off the guidance, which they haven't yet, of preventing advertising and hosting live ticketed events at this time. They said incidental music- Why didn't you ask for a preliminary injunction to modify the executive orders to allow main draw music? Why didn't you ask for that along with a preliminary injunction on the guidance? I'm not sure. I'm trying the best that I can, and then I know a lot of regulations were changing all the time. So, I made the argument that I think- If we disagree with you, if we think the executive orders prohibited your client from performing indoor music without the guidance, then wouldn't it be, as I was discussing with the state, that there would have been no irreparable harm in the absence of an injunction because even with the injunction, your client could not perform live music. In fact, couldn't even do incidental music anyway. So, if anything, the injunction on the incidental music rule further limited your client's ability to perform. Or am I missing something? No. Only because the enjoyment was for the specific language of you cannot advertise and charge for the ticketed events. The district court judge did not require that they remove any other language from the guidance. And what's left over from the guidance- Did your client perform after he got the preliminary injunction? Did he start performing? Well, after he got the preliminary injunction, then enjoined them enforcing it so he was able to perform at SLA-licensed establishments. As defendant's counsel had said earlier that in June when they faced the reopenings, they allowed for SLA-licensed facilities that had a license for live music to host live- I'm confused now. I don't understand. Why did you say to another panel on January 5th your client still couldn't perform? You're telling being asked? There's not a prohibition on him to perform since the rephasing in June. And as I said in terms of- No, no. I'm not talking about rephasing. All the way back, you're talking about last June? Yes, last June. Let me move on to this one question on the merits. Isn't that- The district court indicated there was an over-inclusiveness issue in terms of narrowly tailored and said that the rule significantly restricts a substantial quantity of speech that does not create the same evils that the state is seeking to prevent. And that evil would be having people show up and leave at the same time, staying a long time and shouting. Those ever identified what substantial quantity of speech was restricted that doesn't create those same evils, what would it be? I don't think it's an over-inclusiveness issue is really the point of my question. What example would you give? His being able to express- How this rule, the incidental music rule, significantly restricts a substantial quantity of speech that does not create these evils of people arriving at the same time and staying a long time and shouting. Why is it over-inclusive? He's not able to express his speech through his music at ticketed and advertised events within that facility. It's from my understanding of the order. As part of ticketed events, the time, matter, place restriction, it was my understanding of the order. He cannot perform at those events because he's not allowed to advertise. The district court accepted the state's interest in the things that I just listed and said that the rule was over-inclusive. That suggests there's some quantity of performances that wouldn't have those issues in it. Your client falls within those issues if you believe those are coming at the same time. Do you have any response to that? I would say that the issue of the client performing in that particular venue doesn't change. No facts change. I would argue that all of the reasons that were given for why a main draw artist is different from an incidental music artist is not actually accurate because we're talking about what happens to that performer once they're already in the building and already have patrons. Thank you very much. Ms. Rosenbluth, you've reserved two minutes. If you care to address some of Mr. Speroni's questions that he was asking the court to ask you, if you have any recollection of those questions, perhaps you could take some time to address them. Sure, Your Honor. I believe he was asking for some clarification regarding this language in the new guidance issued April 1st by the DOH regarding passive versus active incidental music. That is a new categorization that further attempts to refine music performances that are now permitted. Just to clarify, all incidental music and all main draw ticketed performances are now permissible subject to capacity restrictions and the like. I don't have a detailed answer to his question because it's beyond the scope of this litigation and I have not had a chance to really contemplate it in great depth, but my understanding is that the DOH has now further refined categories of music in the context of articulating new guidance for all these new categories of music that are now indeed permitted. Just to respond to a couple other points, actually first I'd just like to return to the questions that Judge Bianco was about the boundary between incidental music and main draw music. I think to the extent that there's any definitional trouble there, that sort of sounds in a vagueness challenge that has not been presented at any point in this litigation and there's no record that's been developed on that point. I think it's more of a vagueness problem than an under-inclusive problem. Certainly, the fact that the state has differentiated between different kinds of music is an attempt to narrowly tailor its regulation and as this court recognized in VUGO in 2019, the First Amendment allows the government to address competing concerns by crafting exceptions to speech restrictions and under-inclusiveness is only a problem if it raises doubts about the authenticity of the state's articulated interests and I don't think that there's never really been any dispute that the state has an authentic genuine interest in preventing the spread of COVID-19 and any under-inclusiveness is the result of balancing competing considerations and rather than and it's not and there's just the vagueness challenge has not been properly presented here. Finally, just to respond to two more points made by opposing counsel, one, he suggests that music performers are not allowed to be paid for incidental music, that there's nothing in the guidance that ever performs to limit compensation for incidental music so that's not in the guidance and has no other support in the record that I'm aware of and finally, our letter to the court of April 8th from last week where we said that the SLA guidance was issued at a time when no other venues were allowed to be open, we were talking of course about music venues that have been closed for about a year and were just have been permitted to reopen as of April 2nd so that's obviously the case and we were not intending to communicate to the court that restaurants and bars have been shut down this whole time as we know is not the case and with that, I'll welcome any further questions. Thanks very much, Mr. Rosenbluth. Judge Kears, any questions? No, thank you. Judge Bianco? No, thanks. All right, fine, we'll reserve the decision in Hund against Bradley and we'll turn to the last case on our day count.